UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
DONALD RACKLEY,

                                        Civil Action No.
                                        22-cv-4066

                 Plaintiff,

    -against-                            <u>COMPLAINT</u>


CONSTELLIS, LLC, CONSTELLIS
HOLDINGS, LLC, and
CENTERRA GROUP, LLC

                                        <u>JURY TRIAL DEMANDED</u>

                 Defendants.
------------------------------------------------------------x
Plaintiff, Donald Rackley, by his attorney, the Law Offices of Eric Dinnocenzo, for his

complaint against defendants Constellis, LLC, Constellis Holdings, LLC and Centerra Group,

LLC alleges as follows:


## **INTRODUCTION**

    1.     Plaintiff, Donald Rackley, was and is employed by defendants as a Lead Court

Security Officer at the United States Bankruptcy Court, Southern District of New York.  Mr.

Rackley, a 65-year-old Black male, was denied employment positions and promotions on the

base of his race, color and age, and also because he raised safety concerns regarding court

security officers in terms of their inability to pass required firearms testing and the safety

concerns they posed to courthouse staff, visitors, and other security officers.  After raising these

concerns, Mr. Rackley was removed from his position as lead firearms instructor and suffered

other retaliation.

## PARTIES

2.      At all relevant times, plaintiff, Donald Rackley, was a citizen and resident of Somerset County, New Jersey.

3.      Defendant Constelllis, LLC is a foreign limited liability company organized under the laws of Delaware with its principal place of business located in Virginia.

4.      Defendant Constelllis Holdings, LLC is a foreign limited liability company organized under the laws of Delaware with its principal place of business located in Virginia.

5.      Defendant Centerra Group, LLC is a foreign limited liability company organized under the laws of Delaware with its principal place of business located in Virginia.

6.      Defendant Centerra Group, LLC ("Centerra") is a subsidiary of defendants Constellis, LLC and Constellis Holdings, LLC.

7.      Defendant Centerra Group, LLC ("Centerra"), at all relevant times, has acted under the control and direction of defendants Constellis, LLC and Constellis Holdings, LLC.

8.      The defendants have hundreds of employees and qualify as employers under federal, state, and city anti-discrimination laws.

9.      The defendants are contactors of the federal government.

10.      The employees, agents, and servants of the defendants were, at all times, acting within the scope of their employment and in furtherance of defendants' goals and objectives.

11.      From January 1, 2020 to the present, plaintiff was an employee of defendants.

## VENUE

12.      Defendants regularly conduct business in the Southern District of New York.

13.      Defendants work in and have offices, employees, and equipment that are located in the Southern District of New York.

14.     Plaintiff's employment was based out of the Southern District of New York, and the actions that are the subject of this complaint occurred in the Southern District.

15.     Defendants' contacts with the Southern District are sufficient to subject it to personal jurisdiction there if the district was a separate state.

16.     It is not a hardship or inconvenience for defendants to litigate this matter in the Southern District of New York.

17.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332[1] and 1343.

18.     This Court has supplemental jurisdiction over the non-federal law claims pursuant to 28 U.S.C. § 1367.

19.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391.

## PRE-SUIT NOTICES AND FILINGS

20.     On or about June 23, 2021, plaintiff filed a Charge of Discrimination against defendants with the New York City District Office of the Equal Employment Opportunity Commission ("EEOC"), Charge No. 520-2021-02409, alleging unlawful discrimination on the basis of race.

21.     More than 180 days passed from the filing of the charge and the EEOC issued a right-to-sue notice on February 17, 2022.

22.     This lawsuit has been timely filed within 90 days of plaintiff's receipt of the EEOC's right-to-sue notice.

23.     On or about April 19, 2022, plaintiff filed a whistleblower retaliation complaint

---

[1] Plaintiff seeks damages greater than $75,000.00.

pursuant to 41 U.S.C. § 4712 with the United States Department of Justice against defendants who are federal contractors.

24.     On or about April 27, 2022, plaintiff added to the substance of that charge via a letter served upon the United States Department Justice.

25.     After the expiration of the statutory time-period of 210 days after receipt of the complaint, plaintiff intends to amend the complaint in this action to include a cause of action for violation of 41 U.S.C. § 4712.

## FACTUAL BACKGROUND

26.     Plaintiff Donald Rackley is a Black / African-American male who is 65-years-old.

27.     From 1984 until his retirement in 2012, Mr. Rackley was an employee of the U.S. Marshals Service (USMS).  His most recent positions were Chief Deputy Marshal (2002 to 2010), Acting U.S. Marshal in the District of New Jersey (2010 to 2011), and Prison Warden (2011 to 2012).

28.     In 2014 he began working as a court security officer in the Southern District of New York in the employment of Inter-Con Security which had a contract with the USMS.

29.     Defendants entered into a contract with the USMS whereupon, effective January 1, 2020, defendants would replace Inter-Con Security and provide court security services at the SDNY.  Plaintiff, along with many other Inter-Con employees, became employees of defendants.

30.     Centerra describes itself as "a prime and subcontractor on multiple domestic contracts to provide security services to the United States Government, including the United States Marshals Service."  Defendants contract with the USMS to provide court security in the Second Circuit, including the United States District Court, Southern District of New York (SDNY).  The USMS is a division of the Department of Justice.

31.     Defendants employ court security officers who act as Special Deputy U.S. Marshals.  Many of these CSO's are former retired U.S. Marshals and law enforcement officers.

32.     The USMS implements the "policies, practices and procedures employed at the federal court facilities."  Defendants are charged with carrying out these policies, practices, and procedures.  Defendants are contractors and subcontractors of the United States Government.

33.     According to Centerra, its "personnel assist the USMS in ensuring the safety of all federal courthouses and employees within the Second Circuit against unauthorized, illegal, and potentially life-threatening activities."  The hierarchy of positions in performing this function within defendants' organization are Contract Manager, District Supervisor, District Lead Court Security Officer, Lead Court Security Officers ("LCSO"), and Court Security Officers ("CSO").

34.      Soon after Mr. Rackley began work as a CSO, he was promoted to an LCSO. Further, in 2017 he took on the position of Lead Firearms Instructor.  In that specific role, he supervised two firearms instructors and coordinated and oversaw the yearly weapons qualification test for the approximately 160 CSOs, which involved administering and scoring firearms tests and ensuring that CSOs could properly handle and secure their firearms.  He remained in that position when defendants were granted the contract in 2020.  In fact, previously, while in the USMS, Mr. Rackley trained many Marshals in firearms instruction and physical arrest and self-defense.

35.     According to the USMS website, in order to be a CSO, **"**To qualify, applicants must also successfully complete an approved firearms course with a U.S. Government issued weapon. To retain their eligibility, incumbents must complete the firearms course annually."[2] Rules and regulations for the firearms testing are also posted elsewhere on the USMS website.[3]

---

[2] https://www.usmarshals.gov/judicial/court_security_officer.htm
[3] https://www.usmarshals.gov/foia/Contracts/2nd%20Circuit/Section%20C.pdf

36.     With Inter-Con there was a culture of passing CSOs on their firearms testing, even if they did not meet performance standards.  Mr. Rackley, however, refused to certify CSOs who could not pass the testing.  Efrain Perez was the District Supervisor when defendants held the contract and he perpetuated this culture.  Thus, this culture of ignoring safety requirements and rules and regulations, and urging instructors to pass CSOs who could not pass the firearms test and posed a safety threat to the public, continued in full force while defendants were responsible for the contract.

37.     Mr. Perez indicated that he wanted Mr. Rackley to pass the CSOs for their firearms test even if they did not have a passing score of 175 or if they did not handle their weapons properly or in a safe manner.  Mr. Rackley made it clear to Mr. Perez and other supervisors employed by defendants that he would not pass any individual who failed the testing and that he viewed CSOs who could not pass the firearms qualifications test to be a threat to the safety of courthouse staff and visitors as well as other security personnel.

38.     Defendants pressured Mr. Rackley to certify CSOs for two reasons: (1) there is cronyism in the workplace, in that the CSOs are a "good old boys" network of former Marshals and law enforcement officers; and (2) defendants need the manpower to be able to keep the contract and bill the government.

39.     During firearms testing in or about April 2020, Mr. Rackley specifically expressed concern to Mr. Perez about the performance of three CSOs: John Panarella, Michael Carbonaro, and James Lattimore.  Mr. Rackley informed him that, variously, they could not timely reload their weapons, did not keep their weapons pointed down range, improperly kept their fingers on the trigger, and did not holster their weapons properly.  In response, Mr. Perez stated that so long as they could meet or exceed the 175 score, he did not care about whether they

complied with range safety requirements or could properly handle their weapons. Mr. Rackley believed these CSOs posed a safety risk to themselves, other CSOs, and courthouse staff and visitors. The ability to properly and safely handle weapons is extremely important from a security and safety standpoint. In fact, firearms supervisors took videos of poorly performing CSOs at the firearms range to document their concerns.

40.    Mr. Perez was upset when he was informed that CSO Panarella had failed his first qualification test, and he directed Mr. Rackley to again administer the qualification test to him. Mr. Rackley thus was instructed to make the drive once again to Cortland, New York, where the original testing occurred, to oversee this second test. Mr. Perez drove there in his own vehicle to oversee the testing which was unusual. The implication was that he wanted to make sure Panarella passed the test, even if he did not meet the requirements. Because CSO Panarella was unable to handle his weapon safely, he voluntarily resigned on the spot rather than complete the testing. All the while, Mr. Rackley felt pressure from Mr. Perez to pass CSO Panarella, not to mention all CSOs who took the test.

41.    CSOs are given three opportunities to take and pass the firearms test. Each year there were typically a handful of CSOs who could not pass. If Mr. Rackley administered two tests to a CSO, and he failed each time, Inter-Con and defendants assigned a different firearms instructor to evaluate the third test and the CSO would then pass. Mr. Rackley does not believe these CSOs should have passed the test.

42.    Mr. Rackley communicated to his supervisors on multiple occasions, including Mr. Perez, John Bolen, who was a Vice-President for defendants, and John Drago, that he reasonably believed that the policies, practices and procedures for firearms testing utilized by defendants and the pressure applied to pass CSOs for their firearms test was in violation of the

firearms testing requirements and posed a substantial and specific danger to public health or safety.

43.     Mr. Rackley made complaints repeatedly from the time defendants assumed the contract for the Southern District of New York through when he was demoted from his position as Lead Firearms Instructor. He made these complaints verbally and in writing, including by email.

44.     Mr. Rackley was retaliated against for articulating his safety concerns.

**Failure to Promote**

45.     Mr. Rackley was denied at least three promotions for which he was clearly the most-qualified candidate.  In the summer of 2020, the Contract Manager position for the Second Circuit became vacant.  As provided in the job description and is evident from the job title, an important qualification is contract management experience.  Further, nearly all the contract personnel are former U.S. Marshals.

46.     John Bolen sent out a notice of the job opening on LinkedIn, but did not include Mr. Rackley as a recipient, even though he had been included in other notices sent by Mr. Bolen. The intent was to keep the opening from plaintiff's attention.

47.     Mr. Rackley applied for the job, but it was given to John Drago in or about September 2020, who was much less qualified.  Drago achieved the role of Chief Inspector, USMS, from 2007 to 2018, and after retirement, was Director of Security at a private school for grades 1 to 8 in a tony Long Island suburb.  Mr. Rackley also held the Chief Inspector position years earlier from 2000 to 2002 and *then subsequently rose higher in the USMS than Mr. Drago* with roles as Chief Deputy U.S. Marshal (2002 to 2010) and Acting U.S. Marshal (2010-2011). A Chief Inspector has very limited contract management experience as the inspectors deal

primarily with federal witnesses.  In contrast, Chief Deputy Marshals perform the full roles of

Marshals and are responsible for managing a budget.  In fact, Chief Deputy Marshals administer

the contract for courthouse security with companies like Centerra.  Moreover, Mr. Rackley was a

current Centerra employee familiar with the courthouse and the functions and administration of

CSO personnel, whereas, as stated, Mr. Drago worked for a private elementary school in Long

Island.  Mr. Drago is a white male who, upon information and belief, is age 55 and thus a decade

younger than Mr. Rackley.

48.     Although a job critera was having a college degree, this played no role in the

selection process.  Mr. Rackley has attended college but does not have a degree.  Whether a

candidate went to college (over thirty or forty years earlier) had no bearing on whether he could

perform the job adequately.

49.     Subsequently, a vacancy occurred for the District Supervisor position in the

SDNY.  While Mr. Perez remained as a District Supervisor, a second position was created.  In or

about November 2020, Mr. Rackley applied for this position, which was publicly-advertised, but

it was given to Stanley Nanartowicz.  Mr. Rackley was informed via email from John Drago on

December 11, 2020 that he was rejected.  Again, Mr. Rackley was much more qualified of the

two.  Mr. Nanartowicz had most recently held the position of Acting Chief Inspector at the

USMS beginning in 2018.  Again, this experience pales in comparison with that of Mr. Rackley.

Mr. Nanartowicz is a white male and, upon information and belief, is age 58.

50.     In an April 2, 2021 email to Mr. Drago, Mr. Rackley expressed an interest in a

SSO Site Supervisor Job and noted that he had the support of the Chief Deputy Marshal at the

SDNY and it was his fifth time applying.  This position was publicly advertised and/or

defendants actively sought applicants for it.  Drago responded, "It was a fast moving situation, and we filled the acting spot with Acevedo."

51.     Mr. Rackley applied for and was qualified for each of these positions.

52.     Defendants advertised for and publicly sought applicants for each of these positions.

53.     Mr. Rackley was rejected for each position in favor of white males who were significantly younger than him and less qualified.

54.     Mr. Rackley was rejected for these positions because of his age, race, color, and in retaliation for having made safety-related complaints, yet he was eminently more qualified than those individuals hired for the positions.

55.     Further, there is a disproportional lack of minority employees at the level of District Supervisor and above for defendants, including specifically a lack of African-American employees, evidencing a pattern or practice of excluding them from management positions.

56.     Defendants have a policy and practice of not promoting or hiring Black persons for upper management positions at the level of District Supervisor and above.

**<u>Removed as Lead Firearms Instructor</u>**

57.     In 2020, approximately a couple months after the CSO Panarella incident, Mr. Rackley was removed from the Lead Firearms Instructor position without being provided with any notice or reason.  This was in retaliation for raising safety concerns about the ability of certain CSOs to pass the qualifications test and for resisting management pressure to pass CSOs even if they failed to pass the firearms testing and posed a safety threat.

58.     After Mr. Rackley was removed from the position, a subsequent appointee

similarly refused to certify CSOs who could not pass the firearms test and this person was also

removed.  Bobby Basso replaced this person.  Basso works for a different section of Centerra,

and so it is unusual for him to be brought into this position.  Defendants utilize him in this role

because he is willing to pass non-performing CSOs.  In fact, a prior District Supervisor, Angelo

D'Addario, told Mr. Rackley that Basso certified CSOs who could not pass the test and who

should not be qualified.

59.     Since being removed from the Lead Firearms Instructor position, Mr. Rackley has

had no role in firearms testing for CSOs.

60.     After Mr. Rackley raised his safety concerns to his supervisors, they refused to

correct the defendants' activities, policies, or procedures.

**Overnight Shifts**

61.     Mr. Rackley was also made to work by himself on overnight shifts in retaliation

for raising safety concerns.  Mr. Rackley works with another CSO at the Bankruptcy Court in

lower Manhattan; thus, two CSOs are supposed to be on duty for the overnight shift.  When this

individual calls in sick or is unable to work, a substitute employee is supposed to be assigned,

but defendants intentionally do not assign a substitute in retaliation for Mr. Rackley's safety

complaints.  Mr. Rackley worked the following overnight shifts by himself:

| 2020 | 2021 |
|------|------|
| June 11 | February 4, 14 |
| August 7 | March 1, 2, 3 |
| October 30 | August 13, 14 |
| December 10, 11, 12, 25 | October 1 |
| | December 30 |

62.     Upon information and belief, defendants bill the government or collect monies or

payments from the government that are the equivalent for having two CSOs work the overnight shift when Mr. Rackley was the only CSO working, thus improperly depriving the government of monies.

**Email**

63.     Defendants have not given Mr. Rackley a Constellis email address, despite other similarly-situated employees having one and despite his requests for one.  The result is to exclude him from participation in the company.

64.     Mr. Rackley has not been provided with an email address on the basis of race and color.  In fact, other Black employees also have not been given an email address.

65.     Mr. Rackley has also not been provided with an email address in retaliation for raising safety concerns.

66.     Mr. Rackley has suffered adverse employment actions in the terms and conditions of his employment.

**First Cause of Action – Declaratory Relief (against all defendants)**

67.     Plaintiff incorporates the foregoing paragraphs as if they have been alleged herein.

68.     Defendants have wrongfully discriminated against plaintiff under federal, state and city anti-discrimination laws and have violated New York Labor Law 740.

69.     Plaintiff seeks a declaration of the rights and obligations of the parties by this Court in accordance with the applicable provisions of law relating to declaratory judgments.

70.     Plaintiff seeks and is entitled to a declaratory judgment establishing that the defendants engaged in unlawful discrimination under the federal, state and city anti-discrimination laws and violated New York Labor Law 740.

## Second Cause of Action – 42 U.S.C. § 1981

71.     Plaintiff incorporates the foregoing paragraphs as if they have been alleged herein.

72.     42 U.S.C. §1981 states as follows: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

73.     Section 1981 further states that, "For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

74.     Defendants discriminated against Plaintiff in violation of the rights afforded to him by the Civil Right Act of 1866, 42 U.S.C. §1981.

75.     By the conduct described above, Defendants intentionally deprived Plaintiff of the same rights as are enjoyed by both other Caucasian and non-Black citizens, to the creation, performance, enjoyment and all benefits and privileges of their employment relationship with defendants.

76.     As a result of defendants' discrimination against plaintiff, he has been denied employment opportunities providing substantial compensation and benefits, thereby entitling him to injunctive and equitable monetary relief, and has suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of Defendants' actions, thereby entitling him to compensatory damages.

77.     Defendants violated 42 U.S.C. §1981 by discriminating against Plaintiff because he is Black and of African-American descent.

78.     Defendants acted with malice or reckless indifference to the rights of Plaintiff, thereby entitling him to an award of punitive damages.

### Third Cause of Action: Title VII

79.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

80.     Title VII of the Civil Rights Act of 1964 states in relevant part that, "It shall be an unlawful employment practice for an employer - (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, …." (42 U.S.C. § 2000e-2(a)(1)).

81.     Defendants have engaged in unlawful employment practices and discrimination against plaintiff based on race and color in violation of Title VII, and plaintiff has suffered damages as a result.

### Fourth Cause of Action: NYSHRL

82.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

83.     Defendants have discriminated against the plaintiff based on race, color, and age in violation of the New York State Human Rights Law (Article 15 of the New York Executive Law).

84.     These defendants' conduct was willful, intentional, made in disregard for the rights of plaintiff, and defendants knew or should have known it was in violation of the NYSHRL, entitling plaintiff to an award of punitive damages.

**Fifth Cause of Action: NYCHRL (against all defendants)**

85.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

86.     Defendants have discriminated against the plaintiff based on his race, color and age in violation of the New York City Human Rights Law (Title 8 of the Administrative Code of New York City).

87.     Defendants' conduct was willful, intentional, made in disregard for the rights of plaintiff, and defendants knew or should have known it was in violation of the NYCHRL, entitling plaintiff to an award of punitive damages.

**Sixth Cause of Action – New York Labor Law § 740**

88.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

89.     The firearms testing requirements for CSOs employed in the Southern District are made and instituted pursuant to federal law, rule, or regulations.

90.     Plaintiff was unlawfully retaliated against by defendants because he disclosed to his supervisors an activity, policy, or practice of defendants that was in violation of a law, rule, or regulation which presented a substantial and specific danger to public safety.

91.     Plaintiff was unlawfully retaliated against by defendants because he disclosed to his supervisors an activity, policy, or practice of defendants that he reasonably believed presented a substantial and specific danger to public safety.

92.     Defendants violated Labor Law § 740, and as a result, plaintiff suffered damages.

93.     Defendants' conduct was willful, intentional, made in disregard for the rights of plaintiff and the public safety, and defendants knew or should have known it was in violation of the Labor Law § 740, entitling plaintiff to an award of punitive damages.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests the Court to enter judgment in his favor

and against defendants, and to accord him the following relief:

(a)     A declaration that defendants have engaged in unlawful discrimination in violation of federal, state, and city law and have violated New York Labor Law § 740;

(b)     Actual damages, including back pay with prejudgment interest and all the fringe benefits to which plaintiff is entitled arising from the failure to promote him;

(c)     Front pay damages for the salary and benefits differential that plaintiff would have received if he had not been discriminated against;

(d)     Injunctive relief placing plaintiff in the Lead Firearms Instructor position and into the promotion for which he was qualified;

(e)     Compensatory damages for plaintiff's non-economic injuries;

(f)     Punitive damages;

(g)     An award of reasonable attorney's fees;

(h)     Interest, costs and disbursements; and

(i)     Such other legal and equitable relief or may be just and proper under the circumstances.

Dated:    New York, New York
          May 18, 2022

                              LAW OFFICES OF
                              ERIC DINNOCENZO

                    By:    *s/Eric Dinnocenzo*
                           Eric Dinnocenzo  (ED 3430)
                           Attorney for Plaintiff
                           469 Seventh Avenue, Suite 1215
                           New York, NY 10018
                           (212) 933-1675
                           eric@dinnocenzolaw.com